# UNITED STATES DISTRICT COURT

for the

Western District of Washington

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Location 10-B,<br>more fully described in Attachment A | )<br>)<br>)<br>)<br>)<br>)   Case No.   MJ20-506 |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Location 10-B, more fully described in Attachment A, incorporated herein by reference.

located in the _____Western_____ District of _____Washington_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841, 846, 843<br>18 USC §§ 1956, 1952, 924(c) | |

The application is based on these facts:

✓   See Affidavit of Alison Wassall, continued on the attached sheet.

☐   Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

_____
*Applicant's signature*

Alison Wassall, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date:   _____08/05/2020_____

_____
*Judge's signature*

City and state:   Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT

County of King            )
                          )
State of Washington       )

I, Alison Wassall, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am employed as a Special Agent (SA) with the United States Drug Enforcement Administration (DEA), and have been so employed since September, 2018.  I am currently assigned to the Seattle Field Division.  In this capacity, I investigate violations of the Controlled Substance Act, Title 21, United States Code, Section 801 et seq., and related offenses.  I have received specialized training in the enforcement and investigation of the Controlled Substance Act.  I have received over 620 hours of classroom and practical training which includes, but is not limited to, drug identification, drug interdiction, detection, money laundering techniques and schemes, smuggling, and the investigation of individuals and/or organizations involved in the illegal possession, possession for sale, sales, importation, smuggling, cultivation, manufacturing and illicit trafficking of controlled substances.

2.      In my role as a Special Agent for the Drug Enforcement Administration, I have participated in narcotics investigations (i.e. heroin, cocaine, fentanyl, marijuana, and methamphetamine) which have resulted in the arrest of individuals and the seizure of illicit narcotics and/or narcotic-related evidence.  I have been involved in the service of search warrants as part of these investigations.  As a result of my experience in serving these search warrants, I have encountered and have become familiar with various tools, methods, trends, paraphernalia and related articles utilized by various traffickers in their efforts to import, conceal, and distribute controlled substances.  Through my training and experience, I can identify illegal drugs by sight, odor, and texture.  Additionally, I have written investigative reports, and conducted and participated in interviews of drug traffickers, of various roles within

AFFIDAVIT OF SA WASSALL- 1

USAO2019R00980

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

drug organizations, which has provided me with a greater understanding of the methods by which drug trafficking organizations operate.

## PURPOSE OF THE AFFIDAVIT

3.     As described herein, there is probable cause to believe that the following offenses have been committed, and are being committed, by Saul Suarez, and others not yet identified:

a.     Distribution of, and possession with intent to distribute, cocaine, methamphetamine, fentanyl, and heroin, and conspiracy to commit these offenses, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1), and 846;

b.     Money laundering and conspiracy to launder money, in violation of Title 18, United States Code, Sections 1956 and 1956(h);

c.     Use of communication facilities to commit, facilitate, or further an act or acts which constitute a felony in violation of Title 21, United States Code, Section 843(b);

d.     Interstate and foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity, in violation of Title 18, United States Code, Section 1952; and

e.     Possession of a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c).

4.     I make this Affidavit in support of an application for a warrant authorizing searches of the subject location, which is further described below and in Attachment A (attached hereto and incorporated by reference as if fully set forth herein), for evidence, fruits and instrumentalities, as further described in Attachment B (attached hereto and incorporated by reference as if fully set forth herein), of violations of the above-listed statutes, committed by the subjects listed above, and others, as described herein.

5.     For the following location, unless noted otherwise, I request that authority to search extend to all parts of the property, including main structure, garage(s), storage structures, outbuildings, and curtilage, and all vehicles, containers, compartments, or

AFFIDAVIT OF SA WASSALL- 2

USAO2019R00980

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   safes located on the property, whether locked or not where the items described in

2   Attachment B (list of items to be seized) could be found.

3        6.      For the following location listed below, I have verified the description of

4   the property, either by personally viewing it myself, or through my discussions with other

5   law enforcement officers who have personally viewed it.

6                           **LOCATIONS TO BE SEARCHED**

7        I submit this affidavit in support of an application under Rule 41 of the Federal

8   Rules of Criminal Procedure for a warrant to search the premises described below

9   (together, "the Premises"): **Target Location 10-B:  13115 Southeast 304th Street,**

10  **Auburn, Washington.**

11                          **SOURCES OF INFORMATION**

12       7.      I have obtained the facts set forth in this Affidavit through my personal

13  participation in the investigation described below; from my review of intercepted calls to

14  date; from oral and written reports of other law enforcement officers; from records,

15  documents, and other evidence obtained during this investigation; and from confidential

16  sources who are associated with and knowledgeable about the subjects of this

17  investigation.  I have obtained and read official reports prepared by various law

18  enforcement officers participating in this and other investigations.  I have not included

19  every fact known concerning this investigation.  I have set forth the facts that I believe

20  are necessary for a fair determination of probable cause for the requested search warrant.

21  During this investigation, investigators have made use of numerous investigative

22  techniques, including but not limited to making controlled purchases of controlled

23  substances; executing search warrants; seizing drugs and drug proceeds; conducting

24  video and physical surveillance; and conducting a financial investigation.

25       8.      When I refer to vehicle ownership or driver's licenses in this Affidavit, I

26  have reviewed the relevant state vehicle records from the Washington State Department

27  of Licensing, or the equivalent agency in other states or countries.  When I refer to the

28  criminal history of a subject, I have read the available criminal history from state or

AFFIDAVIT OF SA WASSALL- 3

USAO2019R00980

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   federal agencies.  When I refer to telephone subscription records, I have read the

2   subscriber records obtained from the telephone company by administrative subpoena or

3   court order, or I have obtained the information from other law enforcement officers

4   familiar with this investigation.  When I refer to telephone toll records, I have received

5   the information from the telephone company pursuant to an administrative subpoena or

6   court-authorized pen registers.  When I refer to customer information regarding utilities,

7   power, or vehicle rentals, I obtained this information pursuant an administrative

8   subpoena.  When I refer to GPS data for telephones, that data was obtained pursuant to

9   court authorization.

**PROBABLE CAUSE**

10

11       9.      The United States, including the DEA, is conducting a criminal investigation of a

12  drug trafficking organization (DTO) operating in the Western District of Washington that

13  distributes narcotics, including heroin, methamphetamine, cocaine, and fentanyl.  Investigators

14  believe Delmer Velasquez-Licona and Saul Suarez are redistributors for the DTO.

15      10.     Since late November 2019, investigators have received multiple court

16  authorizations in the Western District of Washington to intercept wire and electronic

17  communications to and from phones utilized by members of the DTO.  As it pertains to this

18  application, these include:

19      11.     On January 9, 2020, the Honorable U.S. District Court Judge James L. Robart

20  signed an order authorizing the continued interception of the wire and electronic

21  communications to and from 206-531-9979/TT18, and authorizing the initial interception of the

22  wire and electronic communications to and from 425-496-3287/TT19 (utilized by Rodrigo

23  Alvarez-Quinonez, a source of supply for the DTO) and 206-929-8743/TT23 (utilized by

24  Gustavo Sandoval-Agurcia, a redistributor for the DTO).  Interception of the three phones

25  terminated on February 7, 2020.

26      12.     The investigation identified multiple sources of supply and redistributors for the

27  DTO.  On July 29, 2020, 14 individuals were indicted by a federal grand jury for narcotics

28  related offenses to include conspiracy to distribute controlled substances. Urbina-Escoto was

AFFIDAVIT OF SA WASSALL- 4

USAO2019R00980

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  identified as a narcotics associate to Elias Neftali Montes-Sevilla and Sandoval-Agurcia, both

2  who have been indicted.

3       13.    On August 3, 2020, the Hon. U.S. Magistrate Judge Mary Alice Theiler

4  issued search warrants for the following locations and vehicles:

5      Location 1:   14039 Greenwood Avenue North, Apartment 101, Seattle, Washington.

6      Location 2:   6225 123rd Avenue SE, Bellevue, Washington.

7      Location 3:   6305 Saint Albion Way, Apt. M304, Mountlake Terrace, Washington.

8      Location 4:   17902 29th Avenue Northeast, Marysville, Washington.

9      Location 5:   523 Madison Street, Unit 1, Everett, Washington.

10      Location 6:   425 South 156th Street, Apartment A153, Burien, Washington.

11      Location 7:   6135 S 237th Street, Apartment G101, Kent, Washington.

12      Location 8:   2211 South Star Lake Road, Apartment 03-101, Federal Way, Washington.

13      Location 9:   2405 South Star Lake Road, Apartment 70-101, Federal Way, Washington.

14      Location 10: 13115 Southeast 304th Street, Auburn, Washington

15      Location 11: 5926 South Eastwood Drive Seattle, Washington.

16      Location 12: 7720 Timber Hill Dr., Apt. B6, Everett, Washington.

17      Location 13: 703 N 85th St. Apartment 8, Seattle, Washington.

18      Location 14: 12737 30th Avenue NE, Apartment 5, Seattle, Washington.

19      Location 15: 222 59th Pl SE, Everett, Washington.

20      Vehicle 1:   A black 2016 Kia Forte, bearing Washington license BMA8697.

21      Vehicle 2:   A red 2004 Mazda sedan, bearing Washington license plate BQH2220.

22      Vehicle 3:   A 2015 Toyota Camry, bearing Washington license plate BQV2947.

23      Vehicle 4:   A 2016 Honda Civic, bearing Washington license plate BQJ5136.

24      Vehicle 5:   A white 2012 Nissan Altima, bearing Washington license plate BRH5289.

25      Vehicle 6:   A green 1999 Lexus sedan, bearing Oregon license plate 834GWX.

26      Vehicle 7:   A gray 2007 BMW X3, bearing Washington license plate BUB6565.

27      Vehicle 8:   A white 2018 Honda HRV, bearing Washington license plate BMV9084.

28

AFFIDAVIT OF SA WASSALL- 5

USAO2019R00980

Vehicle 9:      A maroon 2006 Mazda 6, bearing Washington license plate BRB8284.

Vehicle 10:    A silver 2006 Lexus sedan, bearing Washington license plate BUB1256.

Vehicle 11:    A 2011 Cadillac Escalade, bearing Washington license plate BHR9186.

January 24, 2020: Suspected narcotics transaction between Gustavo Sandoval-Agurcia and Erick Urbina-Escoto.

14.      On January 23, 2020, at approximately 10:51 a.m. (session #841), TT23 (Sandoval-Agurcia) received an incoming call from TT33 (believed to be utilized by Erick Urbina-Escoto).  During the call, Urbina-Escoto stated that he was thinking of getting more so Sandoval-Agurcia did not have to drive so frequently.  Sandoval-Agurcia then asked if he should take Urbina-Escoto the twenty (20).  I believe that Urbina-Escoto was the holder of 206-468-0651/TT33, discussed below, prior to its discontinued use.  While investigators have not positively identified Urbina-Escoto as the holder of TT33, multiple factors point to him being the holder of the phone, to include surveillance discussed below (in which a vehicle registered to Urbina-Escoto was observed meeting with Sandoval-Agurcia), and Sandoval-Agurcia referring to the user of TT33 as "Erick" during intercepts.  To avoid confusion, the user of TT33 will be referred to as Urbina-Escoto in this affidavit.

15.      Based on the above intercept (session #841), I believe[1] that Urbina-Escoto agreed to receive the "twenty" from Sandoval-Agurcia on January 23, 2020. Investigators were not able to observe the aforementioned transaction, however based on intercepts from January 23, 2020, and the following day (discussed below); it is believed to have taken place.

16.      On January 24, 2020, at approximately 5:39 p.m. (session #935), TT23/Sandoval-Agurcia placed an outgoing call to TT33/Urbina-Escoto.  During the call, Urbina-Escoto asked, "The thing you that you are going to give me.  Is it good?" Sandoval-Agurcia responded, "Yes, it is from the previous one, brother."  Urbina-Escoto

---

[1] For simplicity in this affidavit, when I refer to my beliefs, I am also referring to the beliefs of investigators more senior than I whom I have consulted with throughout this investigation.

AFFIDAVIT OF SA WASSALL- 6

USAO2019R00980

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   then stated, "I just have fifteen, I'm just waiting to get the other five that I gave

2   yesterday." Sandoval-Agurcia stated, "That's weird brother because that work is coming

3   all the way from down there." Sandoval-Agurcia continued, "I know some white guys

4   who add cut in." Urbina-Escoto stated, "I tasted in an aluminum and it left a lot of, it left

5   a lot of extra material that it cannot be burned. You can see it in the, in the aluminum

6   when it has cut in." Sandoval-Agurcia then told Urbina-Escoto, "Bring the aluminum

7   and we try this one, then." Urbina-Escoto then stated, "When he [unknown third party]

8   brings me the five, I will give them to you because he's coming from far away."

9   Sandoval-Agurcia later stated in the same conversation, "I'll head back and you know

10  and you call me when you are ready, and we can, we can meet up by, by Best Buy."

11  Sandoval-Agurcia then clarified, "We'll meet at Best Buy in one hour."

12      17.     Based on my training and experience[2], I believe the above conversations

13  are likely about Urbina-Escoto receiving an unspecified type of narcotic(s) (likely heroin)

14  from Sandoval-Agurcia (likely on January 23, 2020) that contained a "cutting agent" that

15  Urbina-Escoto was dissatisfied with. I believe that when Urbina-Escoto stated, "you can

16  see it, in the aluminum when it has cut in it" he was stating that he had burned the

17  narcotic in aluminum and the "cut" did not burn. Based on my training and experience,

18  narcotics traffickers will utilize various additives to narcotics to increase the volume of

19  the specific narcotic in an effort to sell more. Furthermore, I believe that it is likely

20  Urbina-Escoto picked up twenty (20) total units of an unspecific narcotic from Sandoval-

21  Agurcia and Urbina-Escoto was waiting on the last five (5) before meeting with

22  Sandoval-Agurcia to exchange them. Lastly, I believe Sandoval-Agurcia and Urbina-

23  Escoto agreed to meet in one hour at a Best Buy for the transaction.

24

25

26

27

28

---

[2] For simplicity in this affidavit, when I refer to my training and experience, I am also referring to the training and experience of investigators more senior than I.

AFFIDAVIT OF SA WASSALL- 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

USAO2019R00980

18.     At approximately 7:00 p.m., in an attempt to observe the anticipated narcotics transaction, investigators established surveillance at a Best Buy at the Southcenter Mall, located at 17364 Southcenter Pkwy Tukwila, Washington.

19.     At approximately 7:13 p.m. (session #939), TT23 received an incoming call from TT33.  During the call, Urbina-Escoto asked Sandoval-Agurcia, "Do you have one of blanco [white]?"  Sandoval-Agurcia replied, "No, but I can go pick it up right now."  Urbina-Escoto responded, "How long it would take you to go pick it up?"  Sandoval-Agurcia stated, "fifteen, ten minutes."  Urbina-Escoto then stated, "That's fine, I am thirty minutes exactly from there, from, from, the Best Buy."  Based on my training and experience, I believe that "blanco" or "white" was a reference to cocaine.

20.     At approximately 8:00 p.m., according to electronic tracking data, Target Vehicle 3 (TV3 - WA/BSF7590, silver Toyota Camry) arrived in the vicinity of a Chinese food restaurant, just south of the aforementioned Best Buy.[3]  At approximately 8:05 p.m., an investigator observed an unknown person at the driver's side window of TV3.  Shortly thereafter, an investigator observed the same unknown person walk away from TV3, enter into the driver's seat of a Honda HR-V (Washington State license plate BMV9084) (Vehicle 8), and depart the area.  Moments later, an investigator observed Sandoval-Agurcia standing outside of TV3.  At approximately 8:06 p.m., electronic tracking data indicated TV3 departed the area.

21.     According to WA DOL, Vehicle 8 is registered to Erick Manuel Urbina-Escoto at 24721 16th Avenue South Des Moines, Washington.

22.     After the aforementioned surveillance operation, investigators intercepted a conversation over TT23 between Urbina-Escoto and Sandoval-Agurcia indicating both wanted to change their phones after observing unrelated police activity in the area.  After the suspected transaction was complete, at approximately 8:08 p.m., TT23 placed an

---

[3] TV3 is known by investigators to be utilized by Sandoval-Agurcia in this investigation and was being tracked pursuant to a tracking warrant at the time of the observation.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   outgoing call to TT33 (Session #945).  During the call, Urbina-Escoto inquired, "Did you
2   see where they have one, they have one guy over there.  I don't know.  Over there
3   by….on the other side of the Best Buy.  All the police is there…"  Sandoval-Agurcia
4   stated, "I came from the back over here, buddy."

5         23.    The two continued in the same conversation about how best to thwart law
6   enforcement.  Sandoval-Agurcia stated, "It would be better that we don't say the name of
7   places.  Just names like from the motherland that we know."  Urbina-Escoto agreed,
8   "Yes.  That would be better.  Like a code."  Sandoval-Agurcia then stated, "I was just
9   thinking about that right now.  I was like, as an example, we can see in one place, and
10  once we are nearby… we can change quickly to another place more or less nearby."
11  Urbina-Escoto then stated, "That way they [law enforcement] can't locate you right
12  away.  Because for them to get going, they need more time."  I believe this conversation
13  further indicates that the transaction between the two was a narcotics transaction due to
14  Urbina-Escoto and Sandoval-Agurcia both being aware of police and discussing ways to
15  thwart them.

16  <u>Information regarding tracking of 360-359-8255/TT47, utilized by Urbina-Escoto</u>

17        24.    Through further interceptions and toll analysis, DEA eventually was able to
18  identify 360-359-8255/TT47 as a suspected "replacement phone" for Urbina-Escoto.  On
19  March 18, 2020, the Honorable U.S. Magistrate Judge Michelle Peterson signed a
20  warrant authorizing the GPS tracking of 360-359-8255/TT47.

21        25.    During the tracking of TT47, investigators observed the phone was
22  overnighting in the area of **13115 SE 304th St., Auburn, Washington** (**Location 10**).
23  Based on my training and experience, I believe this indicated the holder of TT47 likely
24  lived at the aforementioned address.  On March 26, 2020, surveillance was established at
25  **13115 SE 304th St. Auburn, Washington**.  Tracking data for TT47 had indicated the
26  phone was in the area of the aforementioned residence upon surveillance being
27  established.

28

AFFIDAVIT OF SA WASSALL- 9

USAO2019R00980

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

26.     On the same date, at approximately 5:47 p.m., an investigator observed the Honda HR-V (Vehicle 8) depart from the west side of the property.  Surveillance was maintained on Vehicle 8.

27.     At approximately 6:40 p.m., Vehicle 8 arrived and parked on the north side of a Safeway parking lot, located at 23632 Hwy 99, Edmonds, Washington.  At approximately 6:46 p.m., per electronic tracking, TT47 was "pinging" in the vicinity of the aforementioned Safeway.

28.     At approximately 6:50 p.m., an investigator observed an unidentified male (UM2) enter into Vehicle 8.  Vehicle 8 remained in the parking lot.  At approximately 6:55 p.m., the investigator observed UM2 exit Vehicle 8.  Moments later, Vehicle 8 departed the area.  Surveillance was maintained on Vehicle 8, which was followed directly back to **13115 SE 304th St., Auburn, Washington (Location 10)**, arriving at approximately 7:43 p.m., according to remote video surveillance and "pings" for TT47.  Surveillance was subsequently terminated.

29.     Based on my training and experience, the above observations are consistent with a narcotics transaction.  I believe that Vehicle 8/TT47 travelling from Auburn, Washington, to Edmonds, Washington (approximately a 48 mile/56 minute one-way drive according to Google Maps) only to meet an individual in Vehicle 8 for 5 minutes and then return to Auburn is not typical behavior.  Further, as noted above, the vehicle (Vehicle 8) has been utilized for a separate suspected narcotics transaction in this investigation during January 2020.  As explained below, investigators later identified the holder of TT47 as Erick Urbina-Escoto while he was a passenger in the Vehicle 8 on a separate date a week later.  I believe the previous intercepts/suspected narcotics transaction noted above (January 24, 2020), and Urbina-Escoto being the holder of TT47, make it more likely the observations on March 26, 2020 were also a narcotics transaction.

Identification of Urbina-Escoto as holder of TT47

30.     On April 2, 2020, at approximately 2:45 p.m., an investigator observed TT47 was "pinging" in the area of North 145th Street and Aurora Avenue North in

AFFIDAVIT OF SA WASSALL- 10

USAO2019R00980

Seattle, Washington.  Shortly thereafter, an investigator observed Vehicle 8 on a vehicle lift outside "JE Wheels, Tires, and Accessories" located at 14355 Aurora Avenue North Seattle, Washington.  Surveillance was maintained on Vehicle 8.  TT47 continued to "ping" in the vicinity of 14355 Aurora Avenue during the surveillance.

31.    At approximately 3:18 p.m., an investigator observed a female and Hispanic male exit "JE Wheels, Tires, and Accessories" and enter into Vehicle 8.  Shortly thereafter, Vehicle 8 departed the area.

32.    At approximately 3:25 p.m., King County Sheriff's Office (KCSO) at the request of DEA conducted an investigative stop of Vehicle 8 in the area of 13501 Aurora Avenue North Seattle, Washington.  During the stop, a female (Charli Anne Childers) was identified as the driver of Vehicle 8 and Erick Urbina-Escoto was identified as the passenger by presenting his Washington Driver's License (WDL6742378SB).[4]

33.    At approximately 3:31 p.m., KCSO cleared the stop and Vehicle 8 departed.  Simultaneously, per electronic tracking, TT47 was "pinging" southbound Aurora Avenue, indicating the phone also had departed the stop location. Shortly thereafter, surveillance was terminated.

Recent information regarding **Location 10**

34.    On May 5, 2020, the Honorable U.S. Magistrate Judge Mary Alice Theiler signed a warrant authorizing the tracking of the white Nissan (Vehicle 5), utilized by Montes-Sevilla and Avila-Gamez as described above.  On May 9, 2020, investigators installed a tracking device on Vehicle 5.

35.    On May 20, 2020, at approximately 2:10 p.m., according to tracking data, Vehicle 5 departed the area of Montes-Sevilla's known residence/apartment complex (Location 8) and travelled directly to **Location 10**, arriving at approximately 2:29 p.m.

---

[4] It should be noted that even though a female was present with Urbina-Escoto in the HR-V, I still believe Urbina-Escoto, and not the female, was the holder of TT47.  As stated, TT47 was being tracked under a court order as a suspected "replacement phone" utilized by "Erick."  Further, during past intercepts with "Erick" over TT33, the user of the phone was a male.

As noted above, based on previous "pings" and surveillance, **Location 10** is believed to be Urbina-Escoto's suspected residence.  I subsequently reviewed remote video footage from **Location 10** and observed Vehicle 5 arriving at the address at approximately 2:30 p.m.  At approximately 2:57 p.m., I observed Vehicle 5 depart the address consistent with tracking data.

36.     Based on the above information, I believe Montes-Sevilla may now be dealing directly with Urbina-Escoto after the interdiction of Sandoval-Agurcia on February 25, 2020.

37.     During the tracking period for TT47 (which began on March 18, 2020 and was terminated on April 4, 2020, after TT47's use appeared to be discontinued), the phone consistently overnighted in the area of **Location 10**.  Specifically, over 1,000 "pings" out of the approximately 1,444 "pings" we received for TT47 indicated the phone was "pinging" at **Location 10**.  No other location for the phone registered over 90 "pings."  Investigators have also set up remote video surveillance at the aforementioned residence and have observed Vehicle 8 depart and arrive at residence consistent with the "ping" for TT47.  Vehicle 8 appears to park at a secondary outbuilding structure at **Location 10,** located on the southwest portion of the property.  Further, it appears the secondary structure is a separate "residence" from **Location 10,** although it is located on the same property/address.

38.     On June 29, 2020, a review of remote video footage revealed a 2005 Hyundai Tucson (WA/BOJ1434) departing **Location 10**.  According to WA DOL, the vehicle is registered to "Charli A Childers" the same female who was travelling with Urbina-Escoto during the police stop on April 2, 2020.  Further, an investigator believes they have observed this same vehicle (same make, model, and roof rack) parked at **Location 10** as recently as July 30, 2020.  Additionally, on July 2, 2020, video surveillance revealed a white Honda HR-V parked on the property of **Location**

**10**.  Because of distance from the camera, a license plate could not be obtained in this instance; however, the appearance of the HR-V was consistent with the same HR-V we have observed Urbina-Escoto travelling in during this investigation (Vehicle 8).  I believe these recent observations indicate that Urbina-Escoto is still utilizing **Location 10** as his residence.

39.     Further, I believe Urbina-Escoto is still utilizing Vehicle 8 to conduct narcotics transactions, and is currently residing at **Location 10,** where proceeds of narcotics sales and narcotics are likely to be stored.

August 5, 2020: Execution of Search Warrant at **Location 10** and Identification of **Location 10-B**

40.     On August 5, 2020, DEA Seattle executed a warrant at **Location 10**. During the execution of the warrant, investigators observed Urbina-Escoto walking from the main residence: **13115 Southeast 304th Street, Auburn, Washington (Location 10-B].**

41.     Urbina-Escoto was detained. Also detained was Charli Childers, identified as Urbina-Escoto's girlfriend. Additionally, investigators spoke with the identified homeowners of **Location 10-B** (the main residence). The homeowners told investigators that Urbina-Escoto rents out a room of the main residence and stated Urbina-Escoto he has belongings in both the rented room of the main residence and the separate structure (**Location 10**, as described throughout this affidavit). Lastly, during a search of the separate structure (**Location 10**), investigators located suspected heroin and U.S. currency.

42.     The rented room of the main residence is located on the southwest corner behind the garage. The door to the rented room is located on the south side exterior of the main residence and is white in color. The exterior door leads into hallway, and the door to rented room is white in color on the east side.

**KNOWLEDGE BASED ON TRAINING AND EXPERIENCE**

43.     Based upon my training and experience, and my discussions with other experienced officers and agents involved in drug investigations, I know the following:

AFFIDAVIT OF SA WASSALL- 13

USAO2019R00980

a.      Traffickers of controlled substances, and those who assist them, maintain and tend to retain accounts or records of their drug trafficking activities, including lists of drug quantities and money owed, telephone records including contact names and numbers, photographs, and similar records of evidentiary value. These items are generally kept in locations where drug traffickers believe their property is secure and will remain undetected from law enforcement, such as inside their homes, vehicles, storage lockers, and businesses.

b.      Traffickers of controlled substances commonly maintain records reflecting names or nicknames, addresses, and/or telephone numbers of their suppliers, customers and associates in the trafficking organization. Traffickers commonly maintain this information in books or papers as well as in their cellular telephones. Traffickers often maintain cellular telephones for ready access to their clientele and to maintain their ongoing drug trafficking. Traffickers often change their cellular telephone numbers to avoid detection by law enforcement, and it is common for traffickers to use more than one cellular telephone at any one time.

c.      Traffickers maintain evidence of their criminal activity at locations that are convenient to them, including their residences, vehicles, and storage lockers. This evidence often includes not only contraband and paraphernalia, but also financial records, records of property and vehicle ownership, records of property rented, and other documentary evidence relating to their crimes. Drug traffickers sometimes take or cause to be taken photographs and/or video recordings of themselves, their associates, their property, and their illegal product. These individuals often maintain these photographs and recordings in their possession or at their premises.

d.      During the execution of search warrants, it is common to find papers, letters, billings, documents, and other writings which show ownership, dominion, and control of vehicles, residences, and/or storage units.

AFFIDAVIT OF SA WASSALL- 14

USAO2019R00980

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

e.  Persons trafficking and using controlled substances commonly sell or use more than one type of controlled substance at any one time.

f.  Traffickers frequently maintain items necessary for weighing, packaging, and cutting drugs for distribution. This paraphernalia often includes, but is not limited to, scales, plastic bags and cutting/diluting agents and items to mask the odor of drugs.

g.  It is common for drug dealers to also be users of their product, and that it is common for the drug user to maintain paraphernalia associated with the use of controlled substances.

h.  Traffickers frequently maintain records, books, notes, ledgers, travel documents, and other papers relating to the transportation and distribution of controlled substances, including travel records, in locations convenient to them, such as their residences and vehicles.

i.  Traffickers frequently keep on hand amounts of United States currency in order to maintain and finance their ongoing narcotics business. They commonly deal in currency because of its untraceable nature. They sometimes convert their illicit currency into currency equivalents such as cashier's checks and money orders. Traffickers often conceal in secure locations such as their residences and vehicles currency, financial instruments, precious metals, jewelry, and other items of value which are the proceeds of drug transactions, and evidence of consequential financial transactions relating to obtaining, transferring, secreting, or spending large sums of money made from engaging in drug trafficking activities, and financial books, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, and other records showing the management of such assets. Traffickers often have money counters.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

j.      Traffickers often maintain weapons, including guns, ammunition, and body armor, in secure locations such as their residences and vehicles, in order to protect their drugs and drug proceeds.

k.      Traffickers often have false identification documents and identification documents in the names of others in order to conceal their identities.

l.      Traffickers very often place assets in names other than their own, or use fictitious names and identification, to avoid detection of these assets by government agencies, and that even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them.

m.      Illegal drug trafficking is a continuing activity over months and even years. Illegal drug traffickers will repeatedly obtain and distribute controlled substances on a somewhat regular basis, much as any distributor of a legitimate commodity would purchase stock for sale and, similarly, such drug traffickers will have an "inventory" which will fluctuate in size depending upon various factors to include the demand and supply for the product. I would expect the trafficker to keep records of his illegal activities for a period of time extending beyond the time during which he actually possesses illegal controlled substances, in order that he can maintain contact with his criminal associates for future drug transactions, and so that he can have records of prior transactions for which, for example, he might still be owed money, or might owe someone else money. These records are often created in code.

44.      As noted above, drug dealers use cellular telephones as a tool or instrumentality in committing their criminal activity. They use them to maintain contact with their suppliers, distributors, and customers. They prefer cellular telephones because, first, they can be purchased without the location and personal information that land lines require. Second, they can be easily carried to permit the user maximum flexibility in meeting associates, avoiding police surveillance, and traveling to obtain or distribute

AFFIDAVIT OF SA WASSALL- 16

USAO2019R00980

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  drugs. Third, they can be passed between members of a drug conspiracy to allow

2  substitution when one member leaves the area temporarily. Since cellular phone use

3  became widespread, every drug dealer I have contacted has used one or more cellular

4  telephones for his or her drug business. I also know that it is common for drug traffickers

5  to retain in their possession phones that they previously used, but have discontinued

6  actively using, for their drug trafficking business. Based on my training and experience,

7  the data maintained in a cellular telephone used by a drug dealer is evidence of a crime or

8  crimes. This includes the following:

9       a.      The assigned number to the cellular telephone (known as the mobile

10      directory number or MDN), and the identifying telephone serial number

11      (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN),

12      (International Mobile Subscriber Identity, or IMSI), or (International Mobile

13      Equipment Identity, or IMEI) are important evidence because they reveal the

14      service provider, allow us to obtain subscriber information, and uniquely identify

15      the telephone. This information can be used to obtain toll records, to identify

16      contacts by this telephone with other cellular telephones used by co-conspirators,

17      to identify other telephones used by the same subscriber or purchased as part of a

18      package, and to confirm if the telephone was contacted by a cooperating source or

19      was intercepted on a wiretap here or in another district.

20      b.      The stored list of recent received calls and sent calls is important

21      evidence. It identifies telephones recently in contact with the telephone user. This

22      is valuable information in a drug investigation because it will identify telephones

23      used by other members of the organization, such as suppliers, distributors, and

24      customers, and it confirms the date and time of contacts. If the user is under

25      surveillance, it identifies what number he called during or around the time of a

26      drug transaction or surveilled meeting. Even if a contact involves a telephone user

27      not part of the conspiracy, the information is helpful (and thus is evidence)

28      because it leads to friends and associates of the user who can identify the user,

AFFIDAVIT OF SA WASSALL- 17

USAO2019R00980

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

help locate the user, and provide information about the user. Identifying a defendant's law-abiding friends is often just as useful as identifying his drug-trafficking associates.

c.      Stored text messages are important evidence, similar to stored numbers. Agents can identify both drug associates, and friends of the user who likely have helpful information about the user, his location, and his activities.

d.      Photographs on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Pictures also identify associates likely to be members of the drug trafficking organization. Some drug dealers photograph groups of associates, sometimes posing with weapons and showing identifiable gang signs.

e.      Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

## CONCLUSION

45.      Based on the above-described information, there is probable cause to believe that contained within the locations and vehicles, described in Attachment A, there exists evidence, fruits, and instrumentalities, as described in Attachment B, of violations of 21 U.S.C. §§ 841 and 846 (distribution of, and possession with intent to distribute, controlled substances, and conspiracy to do the same), 21 U.S.C. § 843(b) (use of communication facilities to commit,

//
//
//
//
//
//

AFFIDAVIT OF SA WASSALL- 18

USAO2019R00980

facilitate, or further an act or acts which constitute a felony), Title 18, United States Code,

Section 924(c) (possession of a firearm in furtherance of a drug trafficking crime),and 18 U.S.C.

§§ 1956(a)(1)(B)(i) and 1956(h) (money laundering and conspiracy to do the same), committed

by Erick Urbina-Escoto , and others not yet identified:

Alison Wassall
Special Agent
Drug Enforcement Administration

SUBSCRIBED AND SWORN before me this 5th day of August, 2020.

THE HON. MARY ALICE THEILER
United States Magistrate Judge

AFFIDAVIT OF SA WASSALL- 19

USAO2019R00980

**Attachment A**

**Property To Be Searched**

The areas to be searched includes all areas at that location where the Items to Be Seized, listed in Attachment B, could be found.

For physical locations, this includes all areas within and surrounding the primary residence/location, including all rooms, attics, crawlspaces, basements, storage areas, containers, surrounding grounds, garages, carports, trash areas/containers, outbuilding, patios, balconies, yards, secure locations (such as safes), vehicles located on or in the premises, and any persons located within said property or within the residence/location described below.

For vehicles to be searched, this includes all areas of the vehicle, all compartments, and all containers within that vehicle, whether locked or not.

## Location

**13115 SE 304th St., Auburn, Washington**

The location is a rented room located in a main residence.  The rented room of the main residence is located on the southwest corner behind the garage. The door to the rented room is located on the south side exterior of the main residence and is white in color. The exterior door leads into hallway, and the door to rented room is white in color on the east side.



# ATTACHMENT B

## (ITEMS TO BE SEARCHED FOR AND SEIZED)

This warrant authorizes the government to search for and seize the following items that are evidence, fruits, and/or instrumentalities of violations of Title 21, United States Code, Sections 841 and 846 (possession and distribution of controlled substances, and conspiracy thereof) and 843(b) (using a telecommunications facility to facilitate a drug trafficking offense), and Laundering of monetary instruments in violation of 18 U.S.C. § 1956, and possession of a firearm in furtherance of a drug trafficking offense, in violation of 18 U.S.C. § 924(c), as described below.

1. Any controlled substances, including but not limited to growing and processed marijuana, cocaine, crack cocaine, heroin, hashish, methamphetamine, MDMA, methadone, oxycodone, "M30 pills", Oxycontin and fentanyl;

2. Drug Paraphernalia: Items used, or likely to be used, to cultivate, store, process, package, use/consume, and/or distribute controlled substances, such as lights, soil, fertilizer, fans, plastic bags, cutting agents, scales, measuring equipment, tape, hockey or duffel bags, chemicals or items used to test the purity and/or quality of controlled substances, and similar items.

3. Shipping Records and Supplies: USPS, UPS, FedEx, freight companies, and any other packaging materials, including but not limited to boxes and crates, packing tape, shipping labels and invoices, mylar and similar bags, heat and/or vacuum sealing devices, packing peanuts or bubble wrap.

4. Drug Transaction Records: Documents such as ledgers, receipts, notes, invoices, and similar items relating to the acquisition, transportation, and distribution of controlled substances.

5. Customer and Supplier Information: Items identifying drug customers and drug suppliers, such as telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, maps or directions, and similar items.

6. Currency and Financial Records: U.S. Currency, money orders, gift cards and financial records, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; and other records that show income and expenditures, net worth, money transfers, wire transmittals, negotiable instruments, bank drafts, cashier's checks, and similar items, and money counters.

7.     Photographs/Surveillance:  Photographs, video tapes, digital cameras, surveillance cameras and associated hardware/storage devices, and similar items, depicting property occupants, friends and relatives of the property occupants, or suspected growers or buyers or sellers of controlled substances, controlled substances or other contraband, weapons, assets derived from the distribution of controlled substances, and photographs of any documents or other items listed elsewhere in this Attachment.

8.     Weapons:  Including but not limited to firearms, magazines, ammunition, and body armor.

9.     Codes and Passwords:  Evidence of codes used in the distribution of controlled substances, including but not limited to passwords for cell phones and bank accounts.

10.     Property Records:  Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the past, present or future intended purchase, ownership, rental, income, expenses, or control of the premises, and similar records of other properties.

11.     Indicia of occupancy, residency, and/or ownership of assets including, but not limited to, utility and telephone bills, canceled envelopes, rental records or payment receipts, leases, mortgage statements, and other documents establishing occupancy.

12.     Evidence of Storage Unit Rental or Access:  rental and payment records, keys and codes, pamphlets, contracts, contact information, directions, passwords or other documents relating to storage units.

13.     Evidence of Personal Property Ownership:  Registration information, ownership documents, or other evidence of ownership of property including, but not limited to vehicles, vessels, boats, airplanes, jet skis, all terrain vehicles, RVs, and personal property; evidence of international or domestic travel, hotel/motel stays, and any other evidence of unexplained wealth,

14.     Individual and business financial books, records, receipts, notes, ledgers, diaries, journals, and all records relating to income, profit, expenditures, or losses, such as:

a.     Employment records:  paychecks or stubs, lists and accounts of employee payrolls, records of employment tax withholdings and contributions, dividends, stock certificates, and compensation to officers.

b.     Savings accounts:  statements, ledger cards, deposit tickets, register records, wire transfer records, correspondence, and withdrawal slips.

c.  Checking accounts:  statements, canceled checks, deposit tickets, credit/debit documents, wire transfer documents, correspondence, and register records.

d.  Loan Accounts:  financial statements and loan applications for all loans applied for, notes, loan repayment records, and mortgage loan records.

e.  Collection accounts:  statements and other records.

f.  Certificates of deposit:  applications, purchase documents, and statements of accounts.

g.  Credit card accounts:  credit cards, monthly statements, and receipts of use.

h.  Receipts and records related to gambling wins and losses, or any other contest winnings.

i.  Insurance:  policies, statements, bills, and claim-related documents.

j.  Financial records:  profit and loss statements, financial statements, receipts, balance sheets, accounting work papers, any receipts showing purchases made, both business and personal, receipts showing charitable contributions, and income and expense ledgers.

15.    All bearer bonds, letters of credit, money drafts, money orders, cashier's checks, travelers checks, Treasury checks, bank checks, passbooks, bank drafts, money wrappers, stored value cards, and other forms of financial remuneration evidencing the obtaining, secreting, transfer, and/or concealment of assets and/or expenditures of money.

16.    All Western Union and/or Money Gram documents and other documents evidencing domestic or international wire transfers, money orders, official checks, cashier's checks, or other negotiable interests that can be purchased with cash,  These documents are to include applications, payment records, money orders, frequent customer cards, etc.

17.    Negotiable instruments, jewelry, precious metals, financial instruments, stored value/prepaid cards, receipts for the purchases and expenditures made on stored value/prepaid cards, and other negotiable instruments.

18.    Documents reflecting the source, receipt, transfer, control, ownership, and disposition of United States and/or foreign currency.

19.    Correspondence, papers, records, and any other items showing employment or lack of employment.

20.     Telephone books, and/or address books, facsimile machines to include the carbon roll and/or other memory system, any papers reflecting names, addresses, telephone numbers, pager numbers, cellular telephone numbers, facsimile, and/or telex numbers, telephone records and bills relating to co-conspirators, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists. Also, telephone answering devices that record telephone conversations and the tapes therein for messages left for or by co-conspirators for the delivery or purchase of controlled substances or laundering of drug proceeds.

21.     Safes and locked storage containers, and the contents thereof which are otherwise described in this document.

22.     Tools:  Tools that may be used to open hidden compartments in vehicles, paint, bonding agents, magnets, or other items that may be used to open/close compartments.

23.     Cell Phones: Cellular telephones and other communications devices may be seized, and searched for the following items:

        a.      Assigned phone number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

        b.      Stored list of recent received, sent, and missed calls;

        c.      Stored contact information;

        d.      Stored photographs and videos, addresses, notes, or documents/files of or related to narcotics, currency, firearms or other weapons, evidence of suspected criminal activity, and/or the user of the phone or suspected co-conspirators, including any embedded GPS data associated with those photographs and videos;

        e.      Stored text messages related to the aforementioned crimes of investigation, including Apple iMessages, Blackberry Messenger messages, or other similar messaging services where the data is stored on the telephone;

        f.      Stored emails and information/data on apps, including Cash App and Venmo;

        g.      Stored voicemails;

        h.      Stored web browsing history; and

        i.      Other data, documents, records, images, videos, or other items in whatever form, tending to identify the subscriber of the device, the user of the device, the possessor of the device, and/or dominion and control of the device.

This warrant authorizes imaging or otherwise copying all data contained on the cellular telephones. This warrant also authorizes reasonable efforts to overcome any passcode protection of the cellular telephones.

The review of the data on cellular telephones may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, sworn or non-sworn examiners at any location, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, law enforcement implanting this warrant may deliver a complete copy of the electronic data to the custody and control of attorneys for the government and their support staff for their independent review.